United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERNESTO B. TARANGO,
Petitioner,

v.

WILLIAM KNIPP, et al.,
Respondents.

Case No. 15-cv-02611-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: ECF No. 3

Petitioner Ernesto Tarango seeks a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the Court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition is denied.

## I. PROCEDURAL BACKGROUND

In November 2009, Petitioner was convicted in California state court of two counts of lewd and lascivious conduct, one count of aggravated sexual assault on a child over 10 years old and under 14 years old, and three counts of lewd and lascivious conduct by force, violence, duress, menace, or fear. On January 8, 2010, Petitioner was sentenced to 15 years to life on the aggravated sexual assault charge consecutive to a prison term of 26 years for the remaining five charges. On January 27, 2012, the California Court of Appeal affirmed Petitioner's conviction, People v. Tarango, No. H035167, 2012 WL 269482 (Jan. 27, 2012 Cal. Ct. App.), and on March 1, 2012, the California Supreme Court denied his Petition for Review, ECF No. 13-2 at 101.

Petitioner then filed a state habeas petition with the Superior Court of Santa Clara County on July 2, 2013. Id. at 103. That petition raised three claims of ineffective assistance of trial counsel. Id. at 105. On August 28, 2014, the Superior Court denied Petitioner's state habeas petition and issued a reasoned opinion. ECF No. 13-4 at 53. The California Court of Appeal and California Supreme Court summarily denied Petitioner's subsequent state habeas petitions. ECF

United States District Court
Northern District of California

No. 13-5 at 28, 90. The California Supreme Court's denial of Petitioner's habeas petition was issued on June 10, 2015. On June 11, 2015, Petitioner filed his federal petition for writ of habeas corpus with this court, raising the same three ineffective assistance of trial counsel claims that he had previously raised in state court. The Court held a hearing on the habeas petition on March 22, 2016.

## II. STATEMENT OF FACTS

The Court adopts the following description of the underlying crime and the evidence presented at trial from the California Court of Appeal's decision on direct appeal, which description Petitioner does not contest in his petition:

> The victim Y. was born in 1993. She was 16 years old and a sophomore in high school when she testified. She testified that when she was in elementary school, defendant, her uncle, made her feel special and treated her like a "princess."
>
> Y. testified about three separate incidents that took place on or in front of defendant's couch during summers of 2002 and 2003, when she was staying with defendant and his wife, Celia, in Livermore. One time, they were on the couch, and defendant tried to kiss her on the mouth. She got up and went into the bathroom. Another time, defendant was on the couch and she was on the floor in front of it. He scooted close to her and slid his hands over her shoulders, breasts, and stomach. She moved away from him. The third time, they were together on the couch watching TV, and he scooted close to her and started rubbing her upper and inner thigh. She dropped to the floor to get away from him.
>
> Y. testified that also in 2002, defendant raped her. One day, when Celia had left to do laundry, defendant pulled her into his room, threw her on his bed, and pinned her there. He covered her mouth and told her not to scream. As she struggled against him, he pulled both of their pants down. He started rubbing her thighs with his legs. She felt a sharp, burning pain inside her vagina and felt his penis enter her. He later got off her, and she went to the bathroom. She saw defendant cleaning something near his thighs. She had lots of blood on her underwear, and defendant told her to throw them away and not tell anyone. She put them in the trash because she did not want Celia to find them.[1]
>
> Y. testified about a number of incidents between 2004 and 2005 that occurred at defendant's home after he and Celia had moved to San Jose. One night, she was asleep, and defendant came into her room,

---

[1] Y.'s mother, P., testified that Y. called her at work that day. She was crying and wanted to be picked up. But P. had to work.

rubbed her hip and stomach up to her breasts. When she heard Celia, defendant got up. Y. then wrapped herself in a blanket for protection.

On another day, defendant was underneath the house fixing some pipes and needed a flashlight. When Y. brought it to him, he grabbed her wrist and pulled her down on top of him. He then forced her to hold his erect penis, first outside his pants and again after he exposed it. He ultimately let her go, and she ran back upstairs to wash her hands. Y. said that sometime after that, she was in the playroom with defendant's two sons. Defendant came in, told his sons to leave, and locked the door. He then approached her, pinned her against the wall, and told her that if she ever said anything he would hurt her or her family. On another occasion, Y. was in a bedroom, and defendant came in and locked the door. He then kissed her, pinned her against the wall, and pressed himself against her. She could feel his erect penis. Y. said the last incident occurred when she was around 12. She said defendant came into the room she was in, threw her on the floor, and pinned her there. He tried to kiss and touch her, but she fought back and told him that the next time he tried to touch her, she would kill him.

For some years, Y. did not tell anyone that defendant had molested her. She said she did not want to cause defendant trouble with his children, whom she cared about, and did not want them [to] have to grow up without a father, as she did. Two or three years before testifying in court, she told two close family friends, Jose and Paula.[2] Sometime later, Y. told her boyfriend, who then convinced her that she had to tell her mother. When she disclosed the molestation to her mother and stepfather, they were shocked, and all three went to defendant's house and confronted him. He denied molesting Y., laughed, and called her a liar.

In 2009, Y. disclosed the molestation to Dr. Lee Anna Botkin, who was her pediatrician. Dr. Botkin immediately reported this to the police. Y. gave statements to the San Jose Police Department and the Santa Clara County Sheriff's Office.

Dr. Botkin is a board-certified pediatrician, who has conducted thousands of genital exams on children and as a result had reported several cases of suspected child abuse. Dr. Botkin was also very familiar with a childhood skin disorder called alopecia areata, which involves hair loss on the scalp. Dr. Botkin testified as an expert on the diagnosis of alopecia areata and the medical evaluation of sexually abused children.

Dr. Botkin, who had been Y.'s pediatrician from when Y. was seven years old, reviewed Y.'s medical records. Over the years since 2002 and 2006, she had seen Y. for bloody stool, vaginal bleeding and irritation, stomach pain, and hair loss consistent with alopecia areata. At times, she noticed a nodule on Y.'s hymen; and vaginal

[2] Both Jose and Paula testified that two or three years before, Y. told them that defendant had molested her.

and vulvar infection, irritation, and/or discoloration. However, at the time, Dr. Botkin did not consider any of these conditions to be indications of sexual abuse or trauma. Indeed, as part of a general examination on certain occasions, Dr. Botkin had asked Y. if she had ever suffered any abuse or trauma, and Y. said she had not. However, in January 2009, Y. and her mother came to the office and told her that defendant had molested her from age eight to 13.

Concerning the bleeding that Y. experienced over a period of time, Dr. Botkin opined that it could have been caused by a urinary tract infection, a problem in Y.'s bowels, trauma, or vaginitis. She ruled out all but vaginitis as the probable diagnosis. When asked whether in retrospect, she had any reason to change her opinion concerning what "might" have been the cause of Y.'s bleeding, Dr. Botkin opined that given Y.'s disclosure of abuse, the "multiple visits for genital complaints seemed consistent with sexual abuse." However, Dr. Botkin reiterated that none of the examinations she and other colleagues had performed over the years showed trauma suggestive of sexual abuse.

Concerning Y.'s hair loss, Dr. Botkin said Y. first reported it in 2006. Dr. Botkin observed four bald patches on her scalp. She explained that the potential causes of alopecia areata are thyroid conditions and fungal infections. She also noted that children sometimes pull out their own hair. However, in light of the research on the disorder and her discussions with dermatologists, she said that there is no generally agreed upon medical opinion concerning its cause.

Mary Ritter, a physician assistant on the Sexual Assault Response Team (SART) at Valley Medical Center, testified as an expert in the medical evaluation of child sexual abuse. She testified that she conducted a SART examination of Y. She knew of Y.'s report that defendant had abused her from ages eight to 12. She also knew that Y. had admitt[ed] having consensual sex once with her boyfriend. Ms. Ritter testified that Y.'s reports of bleeding and painful urination were consistent with physically traumatic events such as tearing or abrasion or penetration. She further testified that her examination of Y.'s hymen suggested prior penetrating trauma consistent with Y's report of abuse. She conceded, however, that she did not know the condition of Y.'s hymen before the exam, there was no evidence of vaginal trauma prior to the exam, and she did not know when the apparent penetrating trauma to Y.'s hymen had occurred.

Carl Lewis, a retired police officer with specialized training in the investigation of child sexual abuse, who had in the past qualified as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS), testified about it in this case. He explained that the syndrome attempts to dispel popular preconceptions and myths concerning circumstances that often present themselves in cases of child sexual abuse that may appear to be inconsistent with a claim of abuse but in fact are not, such as the secrecy that often surrounds its occurrence; the intimidation and rewards that helps maintain the secrecy; the helplessness, lack of resistance, denial, accommodation, and normalization of the abuse that children exhibit to deal with it;

> and the delay in reporting abuse.
>
> ***The Defense***
>
> Celia testified that when Y. and her mother and step-father confronted defendant with Y.'s claim of abuse, she called Y. a liar, and defendant said Y. was crazy. She said that the entire time that she was married to defendant, she stayed inside their home. She said she did not do the laundry when they lived in Livermore; defendant did.[3] Celia further testified that she never saw bloody sheets, and Y. never spent the night at their home in San Jose.
>
> Defendant testified that he was rarely, if ever, alone with Y. And he denied that he ever acted violently or sexually inappropriately toward Y.

People v. Tarango, 2012 WL 269482, at *1-*3.

## III. DISCUSSION

### A. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended section 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

[3] Y. testified that she and defendant were alone when some of the abuse occurred because Celia had left to do the laundry.

arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the [United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Section 2254(d)(1) restricts the source of clearly established law to the United States Supreme Court's decisions. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Section 2254(d) applies to both unexplained and reasoned decisions issued by the state court. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 131 S.Ct. 770, 784–85 (2011) (one-sentence order denying habeas petition analyzed under section 2254(d)); Johnson v. Williams, 133 S.Ct. 1088, 1096 (2013) (order that discusses state law claim but not federal claim rebuttably presumed to be rejection on the merits and therefore subject to section 2254(d)).

**B. Petitioner's Ineffective Assistance of Counsel Claims**

Petitioner raises three claims of ineffective assistance of trial counsel. First, Petitioner alleges that he was deprived of effective assistance of counsel because his trial counsel failed to investigate a potential medical defense. ECF No. 3 at 31. Second, Petitioner claims his trial counsel acted ineffectively by failing to object to Petitioner's having to wear a surgical mask during trial. ECF No. 3-1 at 13. Third, Petitioner asserts his trial counsel acted ineffectively by failing to object to counts 1, 2, and 3 being tried in Santa Clara County, despite the fact that the underlying crimes were alleged to have occurred in Alameda County. ECF No. 3-1 at 14.

All three of these claims were presented to the Santa Clara Superior Court in Petitioner's state habeas petition. ECF No. 13-2 at 105. The Santa Clara Superior Court issued a reasoned opinion rejecting all three claims. ECF No. 13-4 at 53. The California Court of Appeal and California Supreme Court summarily denied Petitioner's subsequent state habeas petitions raising these claims without issuing reasoned opinions. ECF No. 13-5 at 28, 90. Accordingly, in evaluating Petitioner's claims, the Court examines whether the Santa Clara Superior Court's decision denying Petitioner's state habeas petition was contrary to, or an unreasonable application of, federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004) ("When applying [AEDPA], the federal court should review the last reasoned decision by a state court . . . .") (internal quotation marks omitted).[4]

**1. Legal Standard**

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984). To prevail on a claim of ineffectiveness of counsel, the petitioner must

[4] The Court notes that Petitioner's federal habeas petition does not articulate which state court decision Petitioner challenges. ECF No. 3. The Court further notes that both the California Court of Appeal's decision on direct appeal and the Santa Clara Superior Court's decision rejecting Petitioner's state habeas petition included reasoned opinions rejecting Petitioner's ineffective assistance of counsel claim based on trial counsel's alleged failure to investigate a medical defense. See People v. Tarango, 2012 WL 269482, at *3–*6 (direct appeal); ECF No. 13-4 at 53–57 (state habeas). At oral argument, both parties agreed with the Court that the Santa Clara Superior Court's decision denying Petitioner's state habeas petition is the correct decision for the Court to review because it is "the last reasoned decision by a state court." Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington, 131 S.Ct. at 788 (citing Strickland, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Id. at 787 (quoting Strickland, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. Where the petitioner is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. "The likelihood of a different result must be substantial, not just conceivable." Harrington, 131 S.Ct. at 792 (citing Strickland, 466 U.S. at 693). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) ("If the absence of prejudice can be clearly established, we do well to decline the enterprise [of assessing counsel's performance].").

The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential and when the two apply in tandem, review is doubly so." Harrington, 131 S.Ct. at 788 (internal quotation marks and citations omitted). As a result, "the question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. The Strickland prejudice analysis is complete in itself and there is no need for an additional harmless error review under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Avila v. Galaza, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

**2. Analysis**

**a. Failure to investigate a medical defense**

Petitioner argues that "trial counsel rendered ineffective assistance in failing to investigate a medical defense that would have contradicted the state's expert witness's conclusions." ECF No. 3-1 at 7. According to Petitioner, trial counsel should have retained an independent expert to examine the medical evidence presented by the prosecution and to rebut the prosecution's experts at trial, as opposed to merely cross-examining the prosecution's experts. Id. at 7–12. To support this claim, Petitioner has presented the Court with the declarations of Dr. James E. Crawford-Jakubiak and Dr. Lee Coleman. ECF No. 3-1 at 21, 28. Petitioner filed substantially similar declarations from Dr. Crawford-Jakubiak and Dr. Coleman with the Santa Clara Superior Court along with Petitioner's state habeas petition. ECF No. 13-3 at 31, 38.

**i. Dr. Crawford-Jakubiak**

Petitioner has presented the Court with Dr. Crawford-Jakubiak's declaration in an attempt to cast doubt on the trial testimony of Dr. Botkin and Mary Ritter, discussed *supra*, and to support Petitioner's claim that trial counsel acted ineffectively in failing to call a rebuttal expert. In his declaration, Dr. Crawford-Jakubiak stated: "I agree that [Y.'s] complaints were consistent with possible sexual abuse. However, her previous presenting complaints were not specific for sexual abuse." Id. at 24. According to Dr. Crawford-Jakubiak, Y.'s "previous evaluations were entirely consistent with recurrent episodes of vulvovaginitis." Id. Dr. Crawford-Jakubiak further declared that "[w]hen Dr. Botkin offered the opinion that [Y.'s] condition was consistent with sexual abuse, it is my opinion that one is left with the incorrect impression that 'looking back in retrospect,' one can or should extract objective medical evidence of sexual abuse from [Y.'s] prior medical visits." Id. Finally, Dr. Crawford-Jakubiak stated that he "would interpret the appearance of [Y.'s] hymen as being 'indeterminate' as far as whether it is simply her normal anatomy vs. representing a post traumatic change." Id.

In reviewing Petitioner's state habeas petition, the Santa Clara Superior Court considered Dr. Crawford-Jakubiak's declaration with respect to Dr. Botkin's and Ms. Ritter's testimony. The Superior Court concluded that trial counsel did not perform deficiently in failing to retain a

rebuttal expert such as Dr. Crawford-Jakubiak and, moreover, "[e]ven if counsel acted unreasonably in failing to call a rebuttal witness, Ms. Ritter's [and Dr. Botkin's] undamaging testimony did not prejudice Petitioner." ECF No. 13-4 at 56–57.

Regarding the potential effect Dr. Crawford-Jakubiak's testimony would have had on that of Ms. Ritter, the Superior Court noted that "Ms. Ritter testified that although she was 'sitting on the fence,' she nonetheless opined that the findings were 'suggestive' of penetrating trauma." Id. at 54. While Dr. Crawford-Jakubiak would have used the term "indeterminate," instead of "suggestive," the Superior Court concluded that this difference would not have made a difference at trial because Ms. Ritter also testified that she was "unable to differentiate vaginal injuries caused by sexual abuse, as opposed to consensual sex."[5] Id. at 55. Moreover, "Ms. Ritter conceded that she could not tell when the possible damage to [Y.'s] hymen may have occurred, nor even if it was the result of 'vaginal trauma.'" Id. As a result, the Superior Court concluded that the failure to call a rebuttal expert witness such as Dr. Crawford-Jakubiak did not prejudice Petitioner. Id. at 55–56.

Regarding the potential effect Dr. Crawford-Jakubiak's testimony would have had on that of Dr. Botkin, the Superior Court found that "Dr. Botkin's testimony was similarly inconsequential and in any event was basically consistent with Petitioner's proposed expert testimony." Id. at 56. Dr. Botkin testified that "[i]n restrospect, given [Y.'s] disclosure to me . . . multiple visits for genital complaints seemed consistent with sexual abuse." Id. However, the Superior Court concluded that this testimony was not "particularly damaging to Petitioner because it presupposes the credibility of [Y.'s] sexual abuse claims -- the critical issue for the jury to decide." Id. Moreover, Dr. Crawford-Jakubiak's testimony would not have aided Petitioner because "Petitioner's expert reached the same conclusion as Dr. Botkin" that Y.'s complaints were "consistent" with sexual abuse. Id. (quoting Dr. Crawford-Jakubiak as declaring, "I agree that [Y.'s] complaints were consistent with possible sexual abuse.").[6]

---

[5] As the Superior Court noted, it was undisputed that Y. "had consensual sexual intercourse with her teenage boyfriend before Ms. Ritter performed [her] examination on [Y.]." ECF No. 13-4 at 54.

[6] The Superior Court also rejected Petitioner's claim that "Dr. Botkin's testimony regarding

United States District Court
Northern District of California

In his federal habeas petitioner, Petitioner offers no argument why the Superior Court's conclusion that Petitioner could not show prejudice under Strickland "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d). Petitioner argues that this Court should follow the reasoning of the Second Circuit in Gersten v. Senkowski, 426 F.3d 588 (2d Cir. 2005) in which the court, according to Petitioner, "found ineffective assistance of counsel under remarkably similar circumstances where trial counsel failed to seek an independent expert to review the findings of the state's expert who concluded the complaining witness was sexually abused." ECF No. 3-1 at 10. However, the Gersten court relied on the fact that trial counsel in that case "essentially conceded that the physical evidence was indicative of sexual penetration without conducting any investigation to determine whether this was the case." 426 F.3d at 608. By contrast here, "[t]here is no evidence in the record to determine what the extent of defense counsel's investigation into the physical evidence actually was." Jackson v. Yates, No. 07-cv-00099-MHP, 2008 WL 111232, at *9 (N.D. Cal. Jan. 9, 2008).[7]

More importantly, however, in Gersten, the Second Circuit determined that had petitioner's proposed rebuttal expert testified at trial, "[c]ounsel could . . . have presented a strong affirmative case that the charged crime did not occur and the alleged victim's story was incredible in its entirety." 426 F.3d at 608. In particular, the proposed rebuttal expert in Gersten "concluded that the physical evidence did not appear in any respect to be indicative of penetrating trauma to

alopecia misled the jury into believing there is a 'causal link' between alopecia and sexual abuse," because "Dr. Botkin readily conceded on direct examination that there is no 'agreed-upon medical determination of the cause of alopecia.'" ECF No. 13-4 at 57.

[7] Indeed, on direct appeal, the California Court of Appeal stated: "The record is silent concerning defense counsel's trial strategy and choices concerning Y.'s medical history and Dr. Botkin's testimony. Defendant assumes that counsel did not investigate Dr. Botkin's testimony or consider calling an expert. However, it would be speculation on our part to conclude that before trial, counsel conducted no investigation and did not consider calling an expert." People v. Tarango, 2012 WL 269482, at *4. Similarly here, it would be mere speculation for the Court to conclude that trial counsel performed no investigation into a potential medical defense. Petitioner has submitted the declaration of trial counsel to support his claim, but that declaration proves little: Petitioner's trial counsel merely states that he has "no independent recollection of what material [he] received from the District Attorney's Office" and likewise has "no independent recollection of receiving a copy of the colposcopic photographs from the District Attorney's Office. ECF No. 3-1 at 19.

the victim's vagina or anus, and thus none of the medical evidence corroborated the allegations of abuse or the alleged victim's testimony." Id. at 600. The Gersten court also noted that "[i]n light of the [victim's] allegations of continuing rape and sodomy over a period of years, the absence of physical indicia of such abuse," to which the proposed rebuttal expert would have testified, "would necessarily have been troubling to a trier of fact." Id. By contrast, here, Petitioner's proposed rebuttal expert would have testified that Y.'s "complaints were consistent with possible sexual abuse," while "not specific for sexual abuse." ECF No. 3-1 at 24.

Moreover, the testimony of the medical expert that testified at trial in Gersten was more damaging to petitioner in that case than the testimony of Ms. Ritter and Dr. Botkin here. In Gersten, the medical expert testified "that in her professional opinion, her findings 'were highly suggestive of penetrating trauma to the hymen . . . and tearing of the mucosa of the rectum due to the stretching out of the rectal musoca . . . ." 426 F.3d at 595. By contrast, "Ms. Ritter testified that although she was 'sitting on the fence,' she nonetheless opined that the findings were 'suggestive' of penetrating trauma." ECF No. 13-4 at 56–57. As a result, the Court concludes that Gersten is distinguishable because the difference between the medical testimony presented at trial and what could have been presented by a rebuttal expert, had one been called to testify, was far starker than the difference between such testimony in Petitioner's case. See Yates, 2008 WL 111232, at *9–10 (distinguishing Gersten in part because the difference between the testimony of the prosecution's medical expert and that of the petitioner's proposed rebuttal expert was far greater in Gersten).[8]

The Court agrees with the Superior Court's finding that Dr. Crawford-Jakubiak's conclusions did not differ significantly from those of Ms. Ritter and Dr. Botkin. As a result, Petitioner has failed to show that "there is a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Accordingly, the Court concludes that the Superior Court did not

[8] The Court notes that both the prosecution's medical expert in Yates, Ms. Ritter, and the petitioner's proposed rebuttal expert, Dr. Crawford-Jakubiak, are the same individuals as the prosecution's medical expert in this case and the petitioner's proposed rebuttal expert in this case.

United States District Court
Northern District of California

unreasonably apply clearly established Federal law by ruling that Petitioner could not show prejudice in this respect.[9]

**ii. Dr. Lee Coleman**

Next, Petitioner has presented the Court with Dr. Coleman's declaration in an attempt to cast doubt on the trial testimony of Carl Lewis, discussed *supra*, and to support Petitioner's claim that trial counsel acted ineffectively in failing to call a rebuttal expert. At trial, Carl Lewis testified about Child Sexual Abuse Accommodation Syndrome ("CSAAS"), explaining "that the syndrome attempts to dispel popular preconceptions and myths concerning circumstances that often present themselves in cases of child sexual abuse that may appear to be inconsistent with a claim of abuse but in fact are not, such as the secrecy that often surrounds its occurrence; the intimidation and rewards that helps maintain the secrecy; the helplessness, lack of resistance, denial, accommodation, and normalization of the abuse that children exhibit to deal with it; and the delay in reporting abuse." People v. Tarango, 2012 WL 269482, at *3. In his declaration, Dr. Coleman stated that CSAAS "is not a syndrome and CSAAS is not the result of any research of systematic collection of data." ECF No. 3-1 at 30. According to Dr. Coleman, rebuttal testimony to that of Carl Lewis "would have indicated that each of these behaviors [the components of CSAAS: secrecy; helplessness; entrapment and accommodation; delayed, conflicted or unconvincing disclosure; and retraction] may just as easily occur during an investigation of an allegation that is false." Rebuttal testimony would have given the jury "the tools to understand that [CSAAS] is a sham . . . and not a syndrome, since the features are no more characteristic of the behavior of molested children than children making false claims, and based on neither clinical experience nor research . . . ." Id.

The state habeas court reviewed Dr. Coleman's proposed testimony and determined that "Carl Lewis' testimony also did not need a rebuttal witness because his statements were general and not specific to the case." ECF No. 13-4 at 57. The Superior Court concluded that "Dr.

[9] Because the Court concludes that the Superior Court did not unreasonably apply federal law by ruling that Petitioner could not show prejudice, the Court need not determine the reasonableness of the Superior Court's conclusion that trial counsel's performance was inadequate. Strickland, 466 U.S. at 697; Williams v. Calderon, 52 F.3d at 1470 & n.3.

United States District Court
Northern District of California

Coleman would only have minimally challenged those general statements. Moreover, the jury was specifically instructed on how to treat Mr. Lewis' testimony." Id. In essence, the Superior Court concluded that Petitioner had failed to show prejudice under Strickland.

Once again, Petitioner offers no specific argument why the Superior Court's conclusion that Petitioner could not show prejudice under Strickland "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d). After reviewing Mr. Lewis' trial testimony, as well as the declaration of Dr. Coleman, the Court concludes that the Superior Court did not unreasonably apply Strickland's prejudice prong in concluding that Petitioner failed to show prejudice. In particular, the Court notes that Mr. Lewis testified at trial that "[t]he message of the child sexual abuse accommodation syndrome information is that just because [a child] didn't say anything about [abuse] for two years did not mean that it did not happen. *Doesn't mean it did happen, but it doesn't mean that it did not happen by itself*." ECF No. 12-9 at 84. Based on this admission, it was not unreasonable for the Superior Court to conclude that Petitioner was not prejudiced by trial counsel's failure to call a rebuttal expert.

**b. Failure to object to Petitioner's wearing surgical mask**

Second, Petitioner argues that his trial counsel was ineffective because Petitioner "was required to wear a surgical mask for health reasons[10] during the trial," and "his attorney never told him that he had a right to continue the trial until his health was restored." ECF No. 3-1 at 13. The Superior Court rejected this argument, finding "[t]here is also no showing of prejudice in Petitioner wearing the surgical mask. Petitioner had agreed to it and Petitioner has failed to show

[10] Out of the presence of the jury, Petitioner's trial counsel informed the trial judge that he had been "told by the correctional officers [at the jail where Petitioner was housed] that the particular dorm that he was in was quarantined," and, as a result, that Petitioner was wearing a surgical mask to cover his face at the jail. ECF No. 12-9 at 666. Petitioner's trial counsel stated that he spoke to the Court, the District Attorney, and Petitioner about the surgical mask, and that Petitioner "was willing to go forward today in Court with the mask on with the understanding that the Court would give . . . the advisement as to why he was wearing the mask. . . ." Id. The Court advised the jury that Petitioner "may possibly have been exposed to something over the weekend, probably not, but out of caution he is agreeable to wearing a mask. So I want to let you know that, and that's the reason for the mask, for the benefit of everybody's continued health." Id. at 602. According to Petitioner's trial counsel, Petitioner was "satisfied with the procedure that [the Court] followed." Id. at 666.

any connection between wearing the mask and any 'possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints.'" ECF No. 13-4 at 57 (quoting People v. Mar, 28 Cal. 4th 1201, 1216 (2002)).

Petitioner cites not clearly established federal law under which the Court might conclude that Petitioner's trial counsel either acted deficiently or that Petitioner was prejudiced by his wearing a surgical mask at trial. ECF No. 3-1 at 13–14. The only case cited by Petitioner, People v. Mar, is a California Supreme Court case applying California law and determining what procedural requirements must be met by a trial court before compelling the use of a stun belt at trial for security purposes. 28 Cal. 4th 1201, 1219–20 (2002). Moreover, based on the Court's review of the underlying trial record, the Court agrees with the state habeas court that there is not a "reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Accordingly, the Court concludes that the Superior Court did not unreasonably apply federal law in rejecting Petitioner's second ineffective assistance of counsel claim.

**c. Failure to object to venue**

Third, Petitioner argues that his trial counsel was ineffective in failing to object to "Counts 1 through 3 being tried in Santa Clara County" when "the testimony in trial was [that] all those acts occurred in . . . Alameda County." ECF No. 3-1 at 14. The Superior Court rejected this argument, noting that "[c]ounts 1-3 were properly tried in Santa Clara County per Ca Penal C. Sec. 784.7[11] because the District Attorney for the County of Alameda agreed to have the counts tried in Santa Clara." ECF No. 13-4 at 57. Petitioner does not explain in what respect the Superior Court erred in making this determination. Moreover, Petitioner does not cite any clearly

[11] Cal. Penal Code section 784.7(a) provides: "If more than one violation of [Sections 269 or 288] occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial. At the Section 954 hearing, the prosecution shall present written evidence that all district attorneys in counties with jurisdiction of the offenses agree to the venue. Charged offenses from jurisdictions where there is no written agreement from the district attorney shall be returned to that jurisdiction."

established federal law, which the Superior Court is asserted to have applied unreasonably in concluding that Petitioner's trial counsel was not ineffective in failing to object to the trial's venue. Accordingly, the Court concludes that the Superior Court did not unreasonably apply federal law in rejecting Petitioner's third ineffective assistance of trial counsel claim.[12]

Ultimately, all three of Petitioner's claims fail because he has not shown that any decision of the Superior Court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

## IV. CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

[12] In his Reply Brief, Petitioner raises several new arguments. First, Petitioner argues that trial counsel acted ineffectively in failing "to move in limine to exclude and limit the testimony of" the prosecution's medical experts. ECF No. 14 at 11–14. Second, Petitioner contends that his "trial attorney failed to properly cross-examine [Y.], Mary Ritter and Dr. Botkin concerning the medical testimony." ECF No. 14 at 15–16. Third, Petitioner argues that "trial counsel did not properly object to the district attorney's arguments about Mary Ritter and Dr. Botkin." ECF No. 14 at 16–22. The Court need not consider these arguments because Petitioner waited until his Reply Brief to raise them. See Delgadillo v. Woodford, 527 F.3d 919, 930 (9th Cir. 2008) ("Arguments raised for the first time in petitioner's reply brief are deemed waived."); Shelton v. Long, No. 13-cv-7531, 2015 WL 413610, at *18 (C.D. Cal. Jan. 30, 2015) ("[N]ew habeas claims cannot be raised for the first time in reply"); Nazarian v. Uribe, No. 10-cv-6466, 2012 WL 4739915, at *18 (C.D. Cal. Aug. 3, 2012), report and recommendation adopted, No. 10-cv-6466, 2012 WL 4739909 (C.D. Cal. Oct. 4, 2012) ("The Court does not address that subclaim because Petitioner has not raised it in the Petition; he did raise it in the Traverse . . ., but that is insufficient to preserve the claim.").

United States District Court
Northern District of California

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

**CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is denied, and a certificate of appealability is denied.[13]

The Clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

Dated: March 22, 2016



JON S. TIGAR
United States District Judge

[13] The Court denies Petitioner's request for an evidentiary hearing. ECF No. 3 at 34. Petitioner does not suggest why an evidentiary hearing is necessary, but simply states: "[t]o the extent that the state challenges the allegations contained in support of petitioner's claims raised herein, an evidentiary hearing will be required." Id. Petitioner renewed his request for an evidentiary hearing during oral argument, but cited no authority for his request.

A district court may conduct an evidentiary hearing in connection with a habeas petition only in limited circumstances. As set forth in 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . (A) the claim relies on . . . (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Here, Petitioner does not argue that a new rule of constitutional law is at issue. Moreover, Petitioner has not shown that there exists "a factual predicate that could not have been previously discovered through the exercise of due diligence." Accordingly, the Court concludes that a evidentiary hearing is not warranted.